UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

VICTOR HUGO ESPARZA,                    )       Case No. 09-CV-01974-L (JMA)
                                        )
                    Petitioner,         )
                                        )
                                        )       **REPORT AND RECOMMENDATION**
v.                                      )       **DENYING  PETITION FOR WRIT OF**
                                        )       **HABEAS CORPUS**
J. SCHOMIG, Warden, et al.              )
                                        )
                    Respondents.        )
_____        )

## I.    <u>INTRODUCTION</u>

Petitioner Victor Hugo Esparza ("Esparza" or "Petitioner") is a California state prisoner proceeding *pro se* with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  He was convicted by a jury in San Diego Superior Court, case number SCD 198501, of two counts of making a criminal threat (with gang enhancements on each), two counts of resisting an executive officer (with gang enhancements on each), possession of ammunition or a firearm by a person prohibited from possessing ammunition or a firearm, possession of paraphernalia used for narcotics, and possession of 28.5 grams or less of marijuana.  (Lodgment No. 2, Vol. IV at 333-36.) Petitioner asserts his incarceration is unlawful because (1) a motion to suppress

evidence at trial was improperly denied, violating his Fourth Amendment right to be free from unreasonable searches and seizures, (2) his adoptive admissions were admitted as evidence violating his Fifth and Fourteenth Amendment right to remain silent, and (3) an expert testified as to the ultimate issue concerning the gang enhancements in violation of his right to due process under the Fourteenth Amendment.  (First Am. Pet., Doc. No. 5, 6-8.)  After reviewing the Petition, Respondent's Answer and Memorandum of Points and Authorities, Petitioner's Traverse, and the exhibits lodged with the Court, the undersigned recommends that the Petition be **DENIED** for the reasons stated below.

**II.    PROCEDURAL BACKGROUND**

On September 12, 2006, a San Diego County jury convicted Petitioner of two counts of making criminal threats (Cal. Penal Code § 422), two counts of resisting an executive officer (Cal. Penal Code  § 69), possession of ammunition (Cal. Penal Code § 12316(b)(1)), possession of drug paraphernalia (Cal. Health & Safety Code  § 11364), and possession of marijuana (Cal. Health & Safety Code  § 11357(b)).  (Lodgment No. 1 at 88-94.)  The jury found that as to the counts of making criminal threats and resisting an executive officer, Petitioner was acting for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of California Penal Code section 186.22(b)(1).  (Id. at 88-91.)  Esparza also admitted that he had been convicted of a prior serious felony, and had a "strike" under California law.  (Lodgment No. 2, Vol. IV at 340-41.)  On November 16, 2006, the trial court sentenced Petitioner to a total of fourteen years in the custody of the California Department of Corrections – **nine years** for the first count of making criminal threats (two years doubled because of the prior strike, plus five years for the gang enhancement pursuant to Cal. Penal Code section 186.22(b)(1)), nine years to be served concurrently on the second count of making criminal threats, four years to be served concurrently on the count of possession of ammunition, six months to be served concurrently on the count of possession of drug paraphernalia, nine years for each of the counts of resisting an executive officer, stayed

1   pursuant to Cal. Penal Code section 654 (two years doubled, plus the five year gang

2   enhancement for each count) and **five years** to be served consecutively for a prior

3   conviction enhancement pursuant to Cal. Penal Code section 667(a)(1)).  (Id. Vol. V at

4   354-55; Lodgment No. 1 at 132.)

5           Petitioner filed an appeal of his conviction, sentence, and denial of motion to

6   suppress in the California Court of Appeal on July 9, 2007.  (Lodgment No. 3.)  The

7   Court of Appeal affirmed the conviction, sentence, and the trial court's decision to deny

8   the motion to suppress on March 25, 2008.  (Lodgment No. 5.)  Esparza filed a petition

9   for review of the Court of Appeal's decision in the California Supreme Court on May 6,

10  2008.  (Lodgment No. 6.)  The California Supreme Court summarily denied the petition

11  for review on July 9, 2008.  (Lodgment No. 7.)

12          On September 8, 2009, Petitioner filed a Petition for Writ of Habeas Corpus (Pet.,

13  Doc. No. 1) followed, on October 30, 2009, by a First Amended Petition for Writ of

14  Habeas Corpus alleging three claims.  (First Am. Pet., Doc No. 5.)  In Ground One,

15  Petitioner asserts that the trial court erred when it denied his motion to suppress

16  evidence seized from his home because the evidence was seized pursuant to an

17  unlawful arrest and therefore the evidence seized was "tainted fruit of this illegal arrest"

18  under the Fourth Amendment's prohibition of unreasonable searches and seizures.

19  (First Am. Pet. at 6.)  In Ground Two, Petitioner claims that the trial court abused its

20  discretion when it instructed the jury that it "could consider [P]etitioner's failure to deny

21  the police's [sic] accusations as an adoptive admission" in violation of his Fifth

22  Amendment right to remain silent.  (Id. at 7.)  In Ground Three, Petitioner asserts that

23  his right to due process under the Fourteenth Amendment was violated when the trial

24  court allowed a gang expert to testify "that the threats in this case were  . . . absolutely

25  made to promote, assist, and further the criminal conduct by gang members[]," because

26  the expert testified as to the ultimate issue concerning the gang enhancements to

27  Petitioner's sentence.  (Id. at 8.)

28          Respondent filed an Answer to Petition for Writ of Habeas Corpus and a

3

1   Memorandum of Points and Authorities on February 9, 2010.  (Answer, Doc. No. 11;

2   Answer Mem. in Supp. (hereafter "Resp't Mem."), Doc. No. 11-1.)  Petitioner filed a

3   Traverse to the Answer on March 16, 2010.  (Traverse, Doc. No. 14.)  Petitioner then

4   filed an Amended Traverse, received *nunc pro tunc*, on April 14, 2010.  (First Am.

5   Traverse, Doc. No. 15.)

6   **III.   FACTUAL BACKGROUND**

7          The following statement of facts is taken from the appellate court opinion

8   affirming Petitioner's conviction on direct review.  This Court gives deference to state

9   court findings of fact and presumes them to be correct.  28 U.S.C. §2254(e); see also

10  Sumner v. Mata, 449 U.S. 539, 545-47 (1981) (stating that deference is owed to factual

11  findings of both state trial and appellate courts).

12         On April 15, 2006, Christopher Morris, a parole agent for the
    Department of Corrections, received two threatening voicemail messages
13  on his cell phone from a phone with a blocked phone number.  The [first]
    voicemail message[] stated:
14
15         []How ya doin'?  This is Devil, OTNC home boy.  'Member
           me?  I'm the one calling the shots now, bro.  Now check this
16         out.  Ya'll been fucking up.  Getting tired of it, I don't know
           what to do.  Either kill you mother fuckers or just fuck y'all
17         up.  Y'all watch out.  I'm gonna come get you Mr. Morris.
           You ain't shit and your homeboys ain't shit and ya'll with
18         badges ain't shit.  This is Devil, OBS Big Devil, OTNC,
           thirteen ese.
19
           [The second voicemail message stated:]
20
           []How ya doin'?  Check this shit out.  (unin[telligible]) y'all
21         mother fuckers wanna discriminate, stereotype, and label us,
           and use it against us.  Well, you fucking around, I'm gonna
22         start taking one by one out.  You understand?  You either
           get back or you get the fuck shot back.[]
23
           From an examination of phone records, the police were able to
24  ascertain a cell phone number from which the calls to Agent Morris had
    been made, but not the phone subscriber because the caller used a "pay-
25  as-you-go" service.  Examining the content of the voicemail messages, the
    authorities determined the reference to "OTNC" was to the Old Town
26  National City gang; the reference to "OBS" was to Olden Boys, a faction of
    the OTNC gang; and the reference to "Devil" was to the caller's gang
27  moniker.  Police investigation identified Esparza as the only OTNC gang
    member who used the moniker "Devil."  Agent Morris had been Esparza's
28  parole agent from 2003 to 2005, and Agent Morris had given Esparza his
    cell phone number.

1

2       On April 21, 2006, the police arrested Esparza in front of his
        residence.  The police obtained authorization to search the residence first
3       from Esparza's consent, and then[,] after he withdrew his consent, [they
        obtained authorization] from a search warrant.  During the search of his
4       residence, the police observed graffiti saying "OTNC" and "Devil," and a
        cell phone laying on a bed.  The cell phone on the bed was identified as
5       the phone used by the caller to leave the threatening voice mail
        messages.  Additionally, the police found a piece of paper upon which was
6       written the word "Puerco" (meaning "pig" in Spanish), Agent Morris's cell
        phone number, and the scratched-out words "Mr. and Mrs. Morris and
7       family, all parole officers."  The police also found ammunition, a
        methamphetamine pipe, and marijuana.

8       Esparza was interviewed by the police after waiving his *Miranda*[]
        rights.[1]  When asked for his cell phone number, Esparza gave the number
9       of the phone from which the threatening voicemail messages had been
        generated.  He stated he did not know why he made the phone calls to
10      Agent Morris, but that he was tired of being harassed by the police and
        tired of the "typical police attitude."

11      Testifying on his own behalf, Esparza acknowledged that he had
        been in the OTNC gang and used the moniker Devil, and that there was
12      graffiti inside his residence saying "Devil" and "OTNC."  However, he
        stated he stopped his involvement with the OTNC gang in 2002 or 2003
13      and three other OTNC gang members used the moniker Devil.  He
        acknowledged that the ammunition at his residence belonged to him, but
14      claimed the cell phone was left there by someone else.  He claimed that
        he told Agent Morris he did not know anything about the calls, and that
15      during the police interview the police kept insinuating he made the calls
        but he did not say anything to them.

16

17      _____

18          [1]  <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

19  (Lodgment No. 5 at 2-4.)

20  **IV.**   **<u>DISCUSSION</u>**

21      **A.**    **Standard of Review**

22      Title 28, United States Code,  § 2254(a), sets forth the following standard of

23  review for federal habeas corpus claims:

24          The Supreme Court, a Justice thereof, a circuit judge, or a district court
            shall entertain an application for a writ of habeas corpus in behalf of a
25          person in custody pursuant to the judgment of a State court only on the
            ground that he is in custody in violation of the Constitution or laws or
26          treaties of the United States.

27  28 U.S.C.  § 2254(a).

28      The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended

1  section 2254 to provide a "highly deferential standard for evaluating state court rulings."

2  Lindh v. Murphy, 521 U.S. 320 (1997).  Under 28 U.S.C. § 2254(d):

3      (d) An application for a writ of habeas corpus on behalf of a person in
       custody pursuant to the judgment of a State court shall not be granted with
4      respect to any claim that was adjudicated on the merits in State court
       proceedings unless the adjudication of the claim –

5
           (1) resulted in a decision that was contrary to, or involved an
6          unreasonable application of, clearly established Federal law, as
           determined by the Supreme Court of the United States; or
7
           (2) resulted in a decision that was based on an
8          unreasonable determination of the facts in light of the evidence
           presented in the State court proceeding.
9

10  28 U.S.C. § 2254(d)(1)-(2).

11      To obtain federal habeas relief, Esparza must satisfy either § 2254(d)(1) or

12  § 2254(d)(2).  See Williams v. Taylor, 529 U.S. 362, 403 (2000).  The Supreme Court

13  interprets § 2254(d)(1) as follows:

14      Under the "contrary to" clause, a federal habeas court may grant the writ if
       the state court arrives at a conclusion opposite to that reached by this
15     Court on a question of law or if the state court decides a case differently
       than this Court has on a set of materially indistinguishable facts.  Under
16     the "unreasonable application" clause, a federal habeas court may grant
       the writ if the state court identifies the correct governing principle from this
17     Court's decisions but unreasonably applies that principle to the facts of the
       prisoner's case.
18

19  Williams, 529 U.S. at 412-13; see also Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003).

20      Where there is no reasoned decision from the state's highest court, the Court

21  "looks through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501

22  U.S. 797, 801-06 (1991).  If the dispositive state court order does not "furnish a basis for

23  its reasoning," federal habeas courts must conduct an independent review of the record

24  to determine whether the state court's decision is contrary to, or an unreasonable

25  application of, clearly established Supreme Court law.  See Himes v. Thompson, 336

26  F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000)

27  (overruled on other grounds by Lockyer, 538 U.S. at 75-76).  However, a state court

28  need not cite Supreme Court precedent when resolving a habeas corpus claim.  Early v.

6

1  Packer, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the

2  state-court decision contradicts [Supreme Court precedent,]" the state court decision will

3  not be "contrary to" clearly established federal law.  Id.

4  **B.   Petitioner's Full and Fair Opportunity to Litigate His Search and Seizure Claim in State Court Precludes Him from Raising the Issue Again in a Federal Habeas Petition**

5

6  In Ground One of his Petition, Esparza contends that his house was searched

7  and evidence was seized in violation of the Fourth Amendment.  (First Am. Pet. at 6.)

8  Specifically, Petitioner argues he "was unlawfully arrested by police without sufficient

9  probable cause and thus, the consent police obtained immediately after petitioner's

10 arrest was tainted fruit of this illegal arrest." (Id.)  Further, he argues, the observations

11 made by police officers during this initial search were used to obtain the search warrant

12 that was utilized after Petitioner withdrew his consent.  (Id.)  Esparza asserts that

13 because the search was illegal, any evidence collected in connection therewith should

14 have been suppressed by the trial court, and because the trial court denied the

15 suppression motion, Esparza's Fourth Amendment rights were violated.  (Id.)

16 Respondent contends Petitioner cannot raise his Fourth Amendment claim in a federal

17 habeas corpus petition because he had a full and fair opportunity to litigate the issue in

18 state court.  (Resp't Mem. at 6.)

19      Clearly established federal law provides that "where the State has provided an

20 opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may

21 not be granted federal habeas corpus relief on the ground that evidence obtained in an

22 unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S.

23 465, 494 (1976); see also Villafuerte v. Stewart, 111 F.3d 616, 627 (9th Cir. 1997)

24 (finding Villafuerte had full and fair opportunity to litigate in state court and was not

25 entitled to federal habeas relief when he raised his claim in post-conviction proceedings

26 in state court); Gordon v. Duran, 895 F.2d 610, 613 (9th Cir. 1990) (holding Gordon had

27 an opportunity for full and fair litigation of his Fourth Amendment claim in state court

28 even when there was a dispute as to whether Gordon actually litigated that claim).

1    Under Stone, the "relevant inquiry is whether petitioner had the opportunity to

2  litigate his claim, not whether he did in fact do so or even whether the claim was

3  correctly decided." Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

4  California Penal Code § 1538.5 specifically allows criminal defendants to move to

5  suppress evidence obtained in violation of the Fourth Amendment.  This provision

6  provides criminal defendants with an opportunity for "full and fair litigation" of their

7  Fourth Amendment claims, regardless of whether the criminal defendant litigates the

8  issue.  Gordon, 895 F.2d at 613; Cal. Penal Code § 1538.5.

9    Here, Petitioner had ample opportunity in state court for full and fair litigation of

10  his Fourth Amendment search and seizure claim.  Petitioner fully exercised his rights

11  under California Penal Code section 1538.5, and before trial moved to suppress all the

12  evidence from the search of his residence.  (Lodgment No. 1 at 7-12.)  The trial court

13  denied Esparza's motion on the basis that he gave police consent to search his

14  residence.  (Lodgment No. 2, Vol. I at 37-38.)  The trial court found, as a result, that the

15  entry into Petitioner's residence was lawful, the observations therein were lawful, and

16  the subsequent search warrant was lawful.  (Id. at 38.)  Petitioner then appealed to the

17  California Court of Appeal, which reviewed his claim and, in a reasoned decision,

18  affirmed the trial court's denial.  (Lodgment No. 5 at 5-9.)  The appellate court

19  concluded that the record showed "a reasonable ground for the police to believe that

20  Esparza was the person who made the criminal threats."  (Id. at 9.)  The court noted the

21  "facts were sufficient to cause a person of ordinary prudence to have a strong suspicion

22  that Esparza was the caller[,]" which established probable cause for Esparza's arrest

23  and validated the search of his home.  (Id.)  Therefore, the court concluded, Esparza did

24  not show that the trial court erred in denying the suppression motion.  (Id.)  Lastly,

25  Petitioner appealed to the California Supreme Court, which denied his petition for review

26  without comment.  (Lodgment Nos. 6 & 7.)  Petitioner was not only presented with

27  opportunities for a full and fair litigation of his Fourth Amendment claim, but he fully

28  utilized and exhausted his avenues for relief under the state court system.

1  Petitioner's full and fair opportunity to litigate his illegal search and seizure claim

2  in state court precludes Petitioner from raising the issue again for federal habeas

3  review.  See, e.g., Villafuerte, 111 F.3d at 627.  Accordingly, this Court recommends

4  habeas relief be denied as to Ground One.

5
6  **C.    The Trial Court did not Err by Allowing Testimony that Petitioner Failed to Deny Accusations and by Instructing the Jury that it Could Conclude that Petitioner Made an Adoptive Admission.**

7  In Ground Two of his Petition, Esparza asserts that the trial court violated his

8  Fifth and Fourteenth Amendment right to remain silent when it admitted testimony that

9  he did not deny that he had made threatening calls to Agent Morris when he was

10  interviewed by authorities.  (First Am. Pet. at 7.)  Esparza further contends that the trial

11  court violated these rights when the court instructed the jury on adoptive admissions,

12  which provides that if the jury found that Petitioner heard and understood a statement

13  that he would have and could have denied if it were not true, then it could conclude that

14  the defendant admitted the statement was true.  (Id.; see also Lodgment No. 1 at 61

15  (jury instruction on adoptive admissions).)

16  Petitioner raised this claim in his petition for review filed in the California

17  Supreme Court on direct appeal.  (Lodgment No. 6.)  That court denied the claim

18  without citation of authority.  (Lodgment No. 7.)  Accordingly, this Court must "look

19  through" the state supreme court's denial to the state appellate court's opinion as the

20  basis for its analysis.  Ylst, 501 U.S. at 801-06.  In denying Petitioner's claim that

21  adoptive admissions evidence should not have been admitted at trial, the California

22  Court of Appeal stated:

23  After Esparza was arrested and waived his Miranda rights, the
police questioned him about the voicemail messages on [Agent] Morris's
24  phone.  At trial, Officer Evans delineated the various statements made by
Esparza during the police interview.  Officer Evans testified that during the
25  course of the questioning, Esparza stated he did not know why he made
the phone calls but he was tired of being harassed by the police and of the
26  typical police attitude; he referred to himself as the "shot caller" in the
voicemail message because Agent Morris had called him this and he did
27  not like the title; and he would love to "kill...or fuck...up" the authorities as
he stated in the message but he knew he could not do so.  When a
28  detective quoted the portion of the voicemail message stating "get back, or

9

1    you get shot the fuck back," Esparza finished the latter portion of the
2    statement in unison with the detective and smiled.  Esparza acknowledged
     that he had used the moniker Devil and that he had written graffiti stating
3    "OTNC" and "Devil" on the mirror at his residence; however, he claimed he
     had stopped using the moniker two years earlier when he was released
4    from prison.  After Officer Evans presented this testimony regarding
     Esparza's statements, the prosecutor asked: "At any time during that
5    interview, did the defendant deny making the calls to Agent Morris?"
     Officer Evans responded, "No."

6         According to Officer Evans, at one point during the police interview
     Esparza stated that "why he had done it was between him and Mr. Morris
7    and he wasn't going to talk to [the police] about it."  Accordingly, the police
     summoned Agent Morris to speak with Esparza.  Agent Morris testified
8    that he asked Esparza why he had done this because he (Agent Morris)
     did not deserve it.  Esparza agreed that Agent Morris did not deserve it
9    and stated that he (Esparza) was "just being an asshole."  After this
     testimony, the prosecutor asked if Esparza told Agent Morris that he was
10   not the person who made the calls.  Agent Morris responded, "No.  He did
     not deny making the call whatsoever."

11
12        The trial court instructed the jury on the principle of adoptive
     admissions, telling the jury that if it found "someone made a statement
13   outside of court that accused the defendant of the crime and the
     defendant did not deny it...[¶]...[¶] [it] may conclude that the defendant
14   admitted the statement was true.  (See Judicial Counsel of Cal. Crim. Jury
     Instns. (2007-2008) CALCRIM No. 357.)  In closing argument, the
15   prosecutor asserted that Esparza admitted to the police and to Agent
     Morris that he left the threatening voicemail messages when he discussed
16   the messages with them.  Further, the prosecutor argued that Esparza's
     failure to deny making the calls when he was asked about them
17   constituted adoptive admissions.

18        Defense counsel did not object to the evidence, instruction, or
     argument on adoptive admissions.

19   (Lodgment No. 5 at 10-12.)

20              *i.*     ***Federal law concerning the use of a criminal defendant's***
                      ***silence as inculpatory evidence at trial***
21

22        The Ninth Circuit recently analyzed the inculpatory use at trial of a criminal

23   defendant's silence during interrogation in Hurd v. Terhune, 619 F.3d 1080 (9th Cir.

24   2010).  The Ninth Circuit reviewed and summarized existing Supreme Court authority as

25   set forth below:

26        In Miranda v. Arizona, the Supreme Court "held that whenever a criminal suspect

27   is subjected to custodial interrogation, he must be warned of his right to remain silent

28   and informed that any statement he makes can be presented as evidence in court."

1  Hurd, 619 F.3d at 1085 (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  If these

2  warnings are not given, "the prosecution may not use statements, whether exculpatory

3  or inculpatory, stemming from custodial interrogation of the defendant." Id. (citing

4  Miranda, 384 U.S. at 444).  "The Court also indicated that a suspect may **rely on his**

5  **right** to remain silent selectively: 'The mere fact that [the suspect] may have answered

6  some questions or volunteered some statements on his own does not deprive him of the

7  right to refrain from answering any further inquiries until he has consulted with an

8  attorney and thereafter consents to be questioned." Id. at 1085-86 (quoting Miranda,

9  384 U.S. at 445) (emphasis added).[1]

10       In U.S. v. Doyle, "[t]he [Supreme] Court explained that a criminal defendant's

11  **reliance on his right** to remain silent may not be used against him in any way at trial,

12  including for impeachment." Id. at 1086 (citing U.S. v. Doyle, 426 U.S. 610, 618-19

13  (1976) (emphasis added).  "The Court reasoned that Miranda warnings make a

14  suspect's silence 'insolubly ambiguous' because that silence could be 'nothing more

15  than [an] exercise of these Miranda rights.'" Id. (quoting Doyle, 426 U.S. at 617).

16       In Anderson v. Charles, "the Court held that while Doyle 'prohibits impeachment

17  on the basis of a defendant's silence,' it does not 'apply to cross-examination that

18  merely inquires into prior inconsistent statements.'" Id. (quoting Anderson v. Charles,

19  447 U.S. 404, 407-08 (1980)).  "The Court explained that 'a defendant who voluntarily

20  speaks after receiving Miranda warnings has not been induced to remain silent.  As to

21  the subject matter of his statements, the defendant has not remained silent at all." Id.

22

23

24     [1]Respondent cites People v. Hurd, 62 Cal. App. 4th 1084 (2008), in his Answer.
In that case, the California Court of Appeal held that a "defendant has no right to remain

25  silent selectively. Once a defendant elects to speak after receiving a Miranda warning,
his or her refusal to answer questions may be used for impeachment purposes absent

26  any indication that such refusal is an invocation of Miranda rights." Id. at 1093.  This
was held to be an erroneous application of Miranda and was overruled by the Ninth

27  Circuit in Hurd v. Terhune, 619 F.3d 1080 (9th Cir. 2010).  As noted below, however,
the distinction is moot because the record demonstrates that Petitioner failed to remain

28  silent in this case.

1  (citing Anderson, 447 U.S. at 408).

2      "The Supreme Court has clearly established that, after receiving Miranda

3  warnings, a suspect may **invoke his right to silence** at any time during questioning

4  and that his silence cannot be used against him at trial, even for impeachment." Id. at

5  1087 (citing Miranda, 384 U.S. at 473-74; Doyle, 426 U.S. at 618-19) (emphasis added).

6          *ii.   Analysis*

7      As the California Court of Appeal observed,

8          The Anderson rule permitting impeachment based on a defendant's
   failure to reveal information during a voluntary police interview applies
9  here to permit the adoptive admissions evidence.  Esparza was not
   induced to remain silent, and then his silence used against him at trial.
10 Nor do the circumstances indicate that Esparza was relying on his
   Miranda rights ro refuse to answer some questions. . . . Rather, according
11 to the prosecution's witnesses, Esparza waived his right to remain silent,
   voluntarily discussed the phone calls with the authorities, and during this
12 discussion never denied that he made the phone calls.  Because Esparza
   did not expressly or impliedly invoke his right to remain silent during the
13 police interview, there was no constitutional barrier to the prosecution's
   presentation of adoptive admissions evidence arising from his responses
14 during the interview.

15 (Lodgment No. 5 at 14.)

16     Petitioner neither relied on, nor invoked his right to remain silent.  There is

17 nothing in the record from either the San Diego Superior Court or the California Court of

18 Appeal that shows or even suggests that Petitioner ever indicated that he wished to

19 remain silent or otherwise exercise his rights under Miranda and the Fifth and

20 Fourteenth Amendments.  Rather, there is evidence showing that Petitioner **did not**

21 **remain silent** in response to any question presented to him during his interrogation.

22 There was evidence presented at trial that Petitioner gave some verbal response to

23 every question asked.  Only once during the trial was any evidence presented that

24 Petitioner remained silent in response to any interrogation, when Petitioner testified that

25 during the interrogation "[he] would just sit there and say nothing to them."  But this

26 testimony was flatly refuted by the testimony of Detective Evans and by Petitioner's own

27 testimony.  (See Lodgment No. 2, Vol. III at 174-79, 208-09.)  On direct examination,

28 Detective Evans testified as follows:

1    Q.    Now, after searching the residence, what's the next thing you did?

2    A.    Mr. Esparza was taken to San Diego Police Department to be
      processed.

3

4    Q.    Okay. Did you obtain a statement from him at the San Diego Police
      Department?

5    A.    Yes, I did.

6    Q.    And prior to talking to him, did you read him his Miranda rights?

7    A.    Yes.

8    . . .

9    Q.    And did the defendant agree to give up those rights and speak with
      you?

10

11   A.    Yes, he did.

      Q.    Okay. What did he tell you?
12

13   A.    He told me that the marijuana and the glass pipe belonged to him.
      He said he had found the rounds of ammunition a few weeks prior
      to our contact at a friend's house.  That friend told him he could
14    keep the rounds.  [¶]  When we started speaking about the phone
      calls made to Mr. Morris, I asked him why the phone calls were
15    made, and he said that they were made, it didn't matter why.

16   Q.    Okay.  Did you ask the defendant who Devil was?

17   A.    Yes.

18   Q.    And what did he tell you?

19   A.    He told me it was a moniker that he used two years prior - - that he
      stopped using two years prior when he got out of prison.

20

21   Q.    Okay.  What did he tell you with respect to the house on "D"
      Avenue?

22   A.    He told me he had been living there since January.

23   . . .

24   Q.    Now, you testified a minute ago that you talked to the defendant
      about the phone calls made to Agent Morris and that he said, "the
25    phone call was made, it doesn't matter why." [¶]  Were those the
      words he used?

26

27   A.    Yes.

      Q.    Did he say anything else with respect to the phone calls made to
28    Agent Morris?

13

1    A.    Yeah.  He told us that he had referred to himself as the shot caller
2          in the phone calls because Agent Morris had referred to him that
           way when he was paroled out of prison and he didn't like that.  He
3          told us that he didn't know why he had made the phone calls.  He
           told us he wasn't under the influence of any alcohol or narcotics.
4          He said he had been frustrated with being treated poorly by law
           enforcement in general.

5    Q.    Did he say he was "tired of being harassed by the police"?

6    A.    Yes, basically.

7    Q.    Did he say he was "tired of the typical police attitude"?

8    A.    Right.

9    . . .

10   Q.    Did Detective Bernier confront the defendant about the statements
11         that were left on Agent Morris's voicemail?

     A.    Yes, he did.
12
     Q.    What did the defendant say about those?
13
     A.    He said he didn't remember everything he said.  Detective Bernier
14         told him he had said, "I don't know whether to" . . .

15   . . .

16         "I don't know whether to kill you guys or just fuck you up."  And after
17         he said  that Esparza said, "I'd like to do that but I know I can't."

18   . . .

     Q.    And did Detective Bernier confront the defendant with any other
19         statements that were made in the voicemails?

20   A.    Yeah.  There was one more statement.  He said - - Detective
           Bernier told him he said, I don't know - - he said, "get back or get
21         shot the fuck back."  And as Detective Bernier finished that
           sentence saying, "shot the fuck back," Mr. Esparza finished it with
22         him in unison and a smile on his face.

23   (Lodgment No. 2, Vol. III at 174-79.)

24         On direct examination, Petitioner testified as follows:

25   Q.    And once you got down to the central jail, where were you taken?

26   A.    They had - - they sat me down and they tried to interview me.

27   Q.    You use the word "tried" to interview you, what do you mean by
           that?
28

14

A.   Well, they kept insinuating that I was the one that made the phone calls.  So I just - - I would just sit there and say nothing to them.

Q.   And how long did that last?

A.   They had me out there for maybe about 20 minutes.

. . .

Q.   So during the entire time they were trying to interview you outside, you didn't say anything?

A.   Yeah, I did.

Q.   And what was that?

A.   I believe I told them that it didn't matter why the call was made, either way I was under arrest or I was the one that was disrespected for whoever made the phone call.

Q.   So when you made that statement, what were you responding to?

A.   To them saying why did I call him.

(Lodgment No. 2, Vol. III at 208-09.)

As the Ninth Circuit pointed out in <u>Hurd</u>, under the Supreme Court's rulings in <u>Miranda</u>, <u>Doyle</u>, and <u>Anderson</u>, a criminal defendant's silence cannot be used to either inculpate or exculpate the defendant at trial.  Here, however, Petitioner did not remain silent, and therefore the adoptive admission instruction given to the jury was appropriate.

The rationale behind the limitation on the use of a criminal defendant's silence against him at trial is that, after being given <u>Miranda</u> warnings, a defendant's silence is so ambiguous that using that silence to prove facts at trial would be inappropriate. <u>Doyle</u>, 426 U.S. at 617 ("Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.").  If Petitioner had remained silent when asked whether he made the threatening phone calls, it would have been simply unclear whether the defendant was acknowledging his guilt through adoptive admission or exercising his right to remain silent.  However, when Petitioner verbally responded to questioning, this ambiguity

1  disappeared.  When Petitioner verbally responded to every question presented to him,

2  but failed to deny any accusations, it was clear that he was not invoking his right to

3  remain silent under Miranda because he did not, in fact, remain silent.

4      Because Petitioner did not remain silent and failed to deny the accusations

5  against him, his failure to deny the accusations was properly admitted as evidence of an

6  adoptive admission and an instruction on adoptive admissions was properly given to the

7  jury.  When a suspect fails to remain silent after being given Miranda warnings,

8  whatever he says can be used against him at trial.  See Miranda, 384 U.S. at 444;

9  Doyle, 426 U.S. at 617; Anderson, 447 U.S. at 404.

10           ***iii.    If evidence of Petitioner's adoptive admission was error, it was
               harmless beyond a reasonable doubt.***

11

12      Assuming, *arguendo*, that the trial court's admission of evidence of Petitioner's

13  failure to deny accusations, and subsequent jury instruction on adoptive admissions

14  was error, that error was harmless beyond a reasonable doubt.  The evidence of

15  Petitioner's guilt was overwhelming.  See Allen v. Woodford, 395 F.3d 979, 992 (9th Cir.

16  2005), cert denied, 546 U.S. 858 (2005) ("[T]o the extent that any claim of error . . .

17  might be meritorious, we would reject that error as harmless because the evidence of

18  [Petitioner's] guilt is overwhelming.").

19      As the California Court of Appeal noted:

20          According to Officer Evans's testimony, during the police
        interrogation Esparza made repeated statements indicating that he did, in

21      fact, leave messages on Morris's voicemail – i.e., stating he did not know
        why he made the phone calls, explaining why he called himself the "shot

22      caller," stating that he would like to kill or assault the authorities as he
        threatened in the message, and repeating a portion of the message as

23      quoted by the detective. . . .  Additionally, the record contains compelling
        evidence of guilt based on the discovery of the cell phone used to call

24      Agent Morris at Esparza's residence; the observation of gang-related
        graffiti at Esparza's residence consistent with the caller's identification of

25      himself as Devil from OTNC; the evidence that Esparza was an OTNC
        gang member who used the moniker Devil; and the preexisting

26      relationship between Agent Morris and Esparza.

27  (Lodgment No. 5 at 16.)

28      There is ample and persuasive evidence of Petitioner's guilt irrespective of any

1  evidence of adoptive admission.  Viewing the record as a whole, there is no reasonable

2  possibility the jury's verdict would have been different had the evidence of Petitioner's

3  adoptive admission been excluded.  The admission of the evidence of adoptive

4  admission did not "so fatally infect[ ] the proceedings as to render them fundamentally

5  unfair[ ]" because the evidence of Petitioner's guilt was overwhelming.  See Jammal v.

6  Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).   Therefore, even if the admission of

7  this evidence was improper, it was harmless beyond a reasonable doubt.  See id.

8       **D.    The Admission of the Gang Expert's Opinion Testimony does not
               Present a Cognizable Claim for Federal Habeas Relief**

9

10       Petitioner argues in Ground Three of the First Amended Petition that the trial

11  court's admission of the testimony of the prosecution's gang expert violated his

12  constitutional right to due process.  (First Am. Pet. at 8.)  Specifically, Petitioner asserts

13  that the trial court erred by allowing the expert to give his opinion as to the "ultimate

14  issue" in the case when he testified that it was his belief that Petitioner made threatening

15  phone calls to Agent Morris to benefit a criminal street gang.  (Id.; see also Lodgment

16  No. 2, Vol. III at 129-30.)  Petitioner contends that, as a result, the true findings on the

17  gang enhancements should be reversed.  (First Am. Pet. at 8.)

18       The Ninth Circuit has stated:

19              [E]vidence erroneously admitted warrants habeas relief only when it
         results in the denial of a fundamentally fair trial in violation of the right to
20       due process.  See Estelle v. McGuire, 502 U.S. 62, 67-68 [ ] (1991).
         Federal habeas courts do not review questions of state evidentiary law.
21       Id.  Our habeas powers do not allow us to vacate a conviction "based on a
         belief that the trial judge incorrectly interpreted the California Evidence
22       Code in ruling" on the admissibility of evidence.  Id. at 72[ ].  With regard
         to expert testimony, we recently noted that we have found no cases
23       "support[ing] the general proposition that the Constitution is violated by the
         admission of expert testimony concerning an ultimate issue to be resolved
24       by the trier of fact."  Moses v. Payne, 543 F.3d 1090, 1105 (9th Cir. 2008).
         "Although '[a] witness is not permitted to give a direct opinion about the
25       defendant's guilt or innocence ... an expert may otherwise testify regarding
         even an ultimate issue to be resolved by the trier of fact.'"  Id. at 1106
26       (quoting United States v. Lockett, 919 F.2d 585, 590 (9th Cir. 1990)
         (alteration in original)).  We found this "not surprising," id., in light of the
27       well-established rule permitting opinion testimony on ultimate issues[.]
         [S]ee Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1016
28       (9th Cir. 2004).

Briceno v. Scribner, 555 F.3d 1069, 1077-78 (9th Cir. 2009).

Because there is no clearly established constitutional right to be free of an expert opinion on an ultimate issue, it cannot be said that the admission of the prosecution gang expert's opinion was contrary to, or an unreasonable application of, Supreme Court precedent.

**E.      The Attorney General is not a Proper Respondent and Should be Dismissed**

Petitioner has improperly named J. Brown, the Attorney General of the State of California, as a respondent in this action.  Rule 2 of the Rules following § 2254 provides that the state officer having custody of the petitioner shall be named as respondent.  Rule 2(a), 28 U.S.C. foll. § 2254.  Only if the petitioner is not yet in custody pursuant to the state-court judgment being contested should both the officer having present custody of the petitioner and the attorney general of the state in which the judgment was entered be named as respondents.  Rule 2(b), 28 U.S.C. foll. § 2254.

Here, there is no basis for Petitioner to have named the Attorney General as a respondent in this action.  Therefore, the Court recommends that the Attorney General of the State of California be dismissed as a named respondent from this action.

**V.      CONCLUSION AND RECOMMENDATION**

Having reviewed the matter, the undersigned recommends that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**. This report and recommendation is submitted to the Honorable M. James Lorenz, the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

//

//

1    **IT IS ORDERED** that no later than **December 27, 2010**, any party may file

2    written objections with the Court and serve a copy on all parties.  The document

3    should be captioned "Objections to Report and Recommendation."

4    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed

5    with the Court and served on all parties not later than **January 18, 2011**.  The

6    parties are advised that failure to file objections within the specified time may

7    waive the right to raise those objections on appeal of the Court's order.  <u>See</u>

8    <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d

9    1153, 1156 (9th Cir. 1991).

10   **IT IS SO ORDERED.**

11   DATED:  November 19, 2010

12

13                                                          Jan M. Adler
                                                            U.S. Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28